# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA,**

**Plaintiff,**

-vs-                                    Case No.  6:05-cv-1053-Orl-31DAB

**OSCEOLA COUNTY, FLORIDA and
DONNA BRYANT, Supervisor of Elections,**

**Defendants.**

_____

## MEMORANDUM OPINION

The United States filed a Complaint (Doc. 1) against Osceola County, Florida (the "County") and Donna Bryant ("Bryant") (collectively referred to where appropriate as the "Defendants") alleging violations of Sections 2 and 12(d) of the Voting Rights Act, 42 U.S.C. §§ 1973, 1973j(d) (the "Act").  The United States then filed a Motion for Preliminary Injunction and Memorandum in support thereof (Docs. 26 and 27).  By its motion, the United States sought to enjoin the Defendants "from seeking to hold or administer elections for open seats on the [Board of Commissioners of Osceola County] until a remedy is implemented under § 2 of the [Act] to cure the dilution of Hispanic votes caused by the County's at-large method of electing for seats on that body."  (Doc. 26 at 1).  After an evidentiary hearing, the Court granted the United States' motion and issued the preliminary injunction (Doc. 43).  The Court then held a trial on the merits of the case on September 18-20, 2006 and the parties submitted post-trial briefs (Docs. 87 and 88) on October 10, 2006.  This Memorandum Opinion contains the Court's findings of fact and conclusions of law.

**I. Background**

*A. Parties and Relevant Entities*

The County is a political subdivision of the State of Florida and exists as a charter county, organized pursuant to Florida law.  Bryant is the Supervisor of Elections for the County.[1]  Her responsibilities include the administration of voter registration and elections in the County.  The Board of Commissioners of Osceola County ("BCC") is a body established under Florida law that is responsible for the governance and administration of the County.

*B. Facts*

1) The County's elections

BCC's members are elected in at-large elections to four-year staggered terms.  Candidates seek election for numbered seats corresponding to the residency districts in which they live.  Thus, although candidates are required to live in particular districts, they are elected at-large by all of the voters in the County.  Candidates are nominated in partisan primary elections.  To date, no Hispanic candidate has ever been elected to the BCC in an at-large election.  (*See* Gov. PI Ex. 3).

2) The County's demographics and initial efforts to modify the system

The County's total population has increased dramatically from less than 50,000 in 1980, at which time Hispanics represented only 2 percent of the County's population.[2]  (PI TR at 52; Govt. PI Ex. 8 at 3).  By the year 2000, more than 170,000 people lived in Osceola County and almost

---

[1] Bryant is sued in her official capacity.  (Doc. 1 at 1).

[2] Various witnesses testified that the term "Hispanic" is one of self-enumeration, meaning that an individual self-selects based on their answer to certain census questions.  (See, e.g., PI TR at 487-88).

30% of them were Hispanic. (PI TR at 42, Govt. PI Ex. 60-A).  The following chart illustrates the growth in the County's population, based on census data from 1980, 1990 and 2000:

| | | 1980 | | 1990 | | 2000 | |
|---|---|---|---|---|---|---|---|
| | | Number | Percent | Number | Percent | Number | Percent |
| Population | Total | 49,287 | 100 | 107,728 | 100 | 172,493 | 100 |
| | Hispanic | 1,089 | 2.21 | 12,866 | 11.94 | 50,727 | 29.41 |
| Voting Age Population | Total | 36,555 | 100 | 80,681 | 100 | 126,279 | 100 |
| | Hispanic | 723 | 1.98 | 8,539 | 10.58 | 34,267 | 27.14 |

(Govt. PI Ex. 60-A).[3]  Between 2000 and 2005, it is estimated that the County's population grew by approximately 36.3% (or more than 62,000 people), to 235,156.  (Govt. PI Ex. 64 at 9).  The Hispanic population, as a portion of all registered voters, grew from approximately 20% in 2000 to almost 31% in 2006.  (PI TR at 494).

As the Hispanic population grew, Hispanic leaders began expressing an interest in achieving political representation at the county level.  For example, in 1990 Ana Erazo, a Hispanic candidate, ran for a seat on the BCC.  Although she carried the predominantly Hispanic Buenaventura Lakes ("BVL") area, she failed to achieve sufficient support in the rest of the County, and lost.  (Govt. PI Ex. 10 at 11).  Hispanic leaders, believing that a single-member district system, whereby only voters living in a particular district could vote for that district's

_____

[3] The dominant portion of the Hispanic population in the County consists of people of Puerto Rican descent (60.6%) (as of the 2000 census).  (Govt. PI Ex. 8 at 4; Govt. PI Ex. 60-B).  Puerto Ricans are automatically United States citizens and, according to the Government's Expert Witness, Dr. Arrington, are more likely to vote and be politically active than virtually every other distinct group of Hispanics except for Cubans.  (PI TR at 55-56).

commissioner, would be more fair to minority voters, called for the elimination of the at-large County election system. In 1991, the Osceola County Hispanic American Association formally requested that the BCC change the election system, and threatened to pursue legal action. (Govt. PI Ex. 10 at 12; Ex. 57-C at 1-2; PI TR at 294-95).

Despite the fact that every incumbent member of the BCC opposed single-member districts, the BCC agreed in 1992 to hold a referendum on changing the election system to a single-member district system. (Govt. PI Ex. 10 at 12). Prior to making that decision and before a vote was held on the matter, the BCC held two public hearings. At the same time, the BCC established district boundaries, keeping the BVL area intact in District 1. (Govt. PI Ex. 10 at 17, Doc. 27 at 5). During the 1992 election, 57% of voters voted in favor of the referendum adopting the single-member district system for BCC elections. (Govt. PI Ex. 10 at 17; PI TR at 295).

3) Attempts to abolish the single-member district system

Within twelve days of passage of the referendum, a request was made that the BCC restore at-large voting on the ground that many people did not understand the ballot language. (Govt. PI Ex. 10 at 20; Ex. 57-C at 2; PI TR at 302-303). Despite proposals that another referendum be called for in November of 1993, the BCC deferred consideration of a referendum on the at-large voting issue until after the 1994 election cycle. (Id. at 21-22).

In 1994, the BCC appointed a private committee to investigate a return to at-large elections. (Govt. PI Ex. 57-Q at 3-4). Each commissioner appointed two members of the committee. (Govt. PI Ex. 10 at 23). The BCC made this committee "private" so it would not be subject to Florida's Sunshine Laws and its members could meet without fearing that their opinions

would be made public.[4]  (Id. at 23-24; Govt. PI Ex. 57-O at 4).  Nevertheless, the chairman of the committee spoke publicly and was enthusiastic in his support of a return to at-large elections.  (Id. at 24).  After several months, the committee disbanded, leaving little public record of its activity. (Id.; PI TR at 309).

In 1995, the BCC appointed an official commission, the Charter Review Advisory Commission ("CRAC"), to consider changes in the structure of the County's government.  (Govt. PI Ex. 10 at 24).    The BCC appointed only non-Hispanic whites to this commission.[5]  (Id. at 25; PI TR at 310).  It was clear from the beginning that one of the primary issues to be addressed by the CRAC was whether to recommend a return to at-large elections.  (Govt. PI Ex. 10 at 24).  At its first substantive meeting on June 2, 1995, prior to holding any public hearings, the CRAC voted 7-1 to recommend that the BCC put at-large elections back on the ballot.[6]  (Id. at 26-27; Govt. PI Ex. 22 at 2; Govt. PI Ex. 56 at 22-23).  However, the County's charter required at least eight votes in favor of a proposal.  (Govt. PI Ex. 10 at 29).  The County Attorney advised the CRAC of this fact in August, and the CRAC scheduled another vote for its October 1995 meeting, at which members of the public were able to express their views on the matter.  (Id.; PI TR at 311-12).

The CRAC voted in favor of placing the at-large election issue on a referendum ballot in 1996.  (Govt. PI Ex. 10 at 29).  The BCC considered the CRAC's recommendation in June of

---

[4]This Court makes no finding as to the applicability of Florida's Sunshine Law to this "private" commission.

[5] This fact aroused considerable discussion at public meetings, and minorities denounced the composition of the CRAC.  (PI TR at 310).

[6] This failure to hold public meetings constituted a departure from the normal procedures of CRACs.  (PI TR at 312).

1996, without putting the issue on the agenda for its meeting (contrary to its normal operating procedures), and voted to place the referendum on the ballot.   (Id. at 32).   After the vote had been taken, the BCC decided, on the advice of the County's attorney, to hold a public hearing on the matter.  (Id.).

In the 1996 election, conducted under a single-member district ("SMD") system, a Hispanic candidate, Robert Guevara, was elected to the BCC from District 1.   During that same election, county voters approved the referendum requiring a return to at-large elections.[7]  (Govt. PI Ex. 10 at 36).[8]  Guevara's campaign generated racial hostility from non-Hispanics including Guevara's opponent, Charles Owen, who sent a campaign mailer that depicted Guevara with darker skin and portrayed him as "Night" and Owen as "Day."  (Govt. PI Ex. 10 at 35).   There were also remarks made, such as, "we do not want Osceola to turn into another Miami."  (Govt. PI Ex. 28 at 2).   The voting in Guevara's contest was racially polarized.[9]  (Govt. PI Ex. 10 at 52-53).

4) Resistance to single-member districts

The BCC appointed new CRACs in both 1999 and 2003, as required by the County's charter.  (Govt. PI Ex. 10 at 37).   The SMD issue remained a key issue before both CRACs,

_____

[7] The parties' experts presented different results on the referendum election.  The Defendants showed that Hispanics voted 55% in favor of the referendum, whereas the Government demonstrated that 53% voted against the referendum.  (PI TR at 98-99).  In any event, it is clear that Hispanic voters split, in a close vote, when voting on the referendum.  (Id.; Govt. PI Ex. 11 at 8).  It is also clear that every precinct voted in favor of returning to at-large elections.  (PI TR at 507-508, 514; Def. PI Ex. 12).

[8] A Hispanic candidate has not been elected to either the BCC or the County's School Board since 1996.  (Govt. PI Ex. 10 at 55).

[9] The 1996 election was characterized by a dramatic upswing in minority participation and in minority candidates for office.  (Govt. PI Ex. 10 at 52, 55).

however, the members voted overwhelmingly against recommending a referendum on changing the method of elections.[10]  (Id.; Def. PI Ex. 13 at 3; Def. PI Ex. 14 at 2-3; Def. PI Ex. 16 at 8). Members of the Hispanic community raised the issue again in 2004 and 2005, but the commissioners failed to act on those requests.  (See, e.g., Govt. PI Ex. 22 at 3-5).

     5) Elections in 2000

Three Hispanic candidates sought nomination to the District 1 seat in the 2000 Democratic Primary.[11]  (Govt. PI Ex. 56 at 8-9).  Dalis Guevara won the primary, but lost a racially polarized general election.  (Id. at 9-10; Govt. PI Ex. 60-G).  Another Hispanic candidate lost the race for the District 5 seat, in another racially polarized election.  (Govt. PI Ex. 56 at 10; Govt. PI Ex. 60-G).

During the 2000 election, Spanish-speaking voters faced a number of barriers, including: being turned away from polls without voting because of an absence of bilingual ballots, instructions or poll workers; being told by poll workers that they could not be accompanied at the polls by a bilingual person, such as a family member, who had come to help them vote; being asked for multiple forms of identification when other voters were not; and being turned away without being offered affidavit ballots.  (Govt. PI Ex. 17 at 2-3; Govt. PI Ex. 29 at 3-5; Govt. PI Ex. 30 at 3; Govt. PI Ex. 34 at 5-6).

---

[10]Commissioners indicated that they found re-election more likely under an at-large system, because incumbents could raise more money. (PI TR at 318).  They also contended that SMDs encourage parochialism but there was no evidence that this is the case. (Govt. PI Ex.22 at 5; Govt. PI Ex. 10 at 28).

[11]District 1 contains the predominantly Hispanic BVL area.

6) 2001 redistricting

In 2001, the BCC appointed a diverse group of citizens to consider and recommend apportionment of the county commissioner districts based on the 2000 Census data.  The Redistricting Advisory Committee ("RAC") was assisted by a reapportionment consultant, Applied Mapping, Inc. ("AMI").  The RAC considered various plans and held two public hearings. One of the hearings was held at a facility in BVL. There was little public input, but several BVL residents suggested that BVL be split so that the residents in that area would have two "accountable" commissioners rather than one.  The RAC accepted this suggestion and approved a plan that split BVL.  That plan was submitted to the BCC and approved with little public opposition.

7) Elections in 2002 and 2004

In the next two election cycles, a total of ten Hispanic candidates ran for countywide offices, including four for the BCC, and they were all defeated in racially polarized elections. (Govt. PI Ex. 56 at 8-12; Govt. PI Ex. 60-G, H).  In the 2004 election, Hispanic candidates once again experienced racial hostility.  (Govt. PI Ex. 29 at 6).

8) The Department of Justice's 2002 lawsuit against the County

The United States sued the County in 2002, alleging that the County denied Spanish-speaking citizens an equal opportunity to vote in County elections in violation of Sections 2 and 208 of the Voting Rights Act.  (Govt. PI Ex. 53).  The United States challenged a number of practices, including the failure of poll officials to communicate effectively with Spanish-speaking voters, the refusal to allow certain Spanish-speaking voters assistance in voting by the person of their choice, and hostile remarks by poll officials.  (Id.).  The Defendants entered into a consent

decree in July 2002 and, as a result, the County's provision of bilingual assistance improved. (Govt. PI Ex. 54; Govt. PI Ex. 55 at 2).  Nevertheless, in 2005, the Department of Justice advised the County that its Spanish language program was not equal in all respects to the English language program in terms of its scope and effectiveness.  (Govt. PI Ex. 55 at 2).  The County agreed, in writing, to continue using the consent decree as a guide in meeting its obligations under the Voting Rights Act and to take additional steps to improve its Spanish language program.  (Id. at 2-3).

*C. Claims and Arguments*

The United States alleges that: (1) Hispanic voters in Osceola County are politically cohesive, sufficiently numerous and geographically compact so that a properly apportioned SMD could be drawn in which Hispanics would constitute a majority; (2) elections for the BCC are characterized by racially polarized voting patterns, wherein non-Hispanic voters vote sufficiently as a bloc to enable them to usually defeat the Hispanic voters' preferred candidate; (3) the County adopted, and has maintained, an at-large method of electing members of the BCC for the purpose of diluting the voting strength of the County's Hispanic citizens; (4) the County has employed electoral features such as residency districts, staggered terms and majority vote requirements that enhance the dilutive effect of the County's at-large election system; (5) many Hispanics have felt the effects of official discrimination in vote-related activities; and (6) the effects of discrimination against Hispanics in Osceola County hinders their ability to effectively participate in the political process.  The United States seeks a declaration that the County's at-large method of electing the BCC violates Section 2 of the Voting Rights Act,[12] and requiring the Defendants to devise and

_____

[12] Section 2 of the Voting Rights Act addresses two types of discriminatory practices: vote denial and vote dilution.  *Burton v. City of Belle Glade*, 178 F.3d 1175, 1196 (11th Cir. 1999).  "Vote

schedule the prompt implementation of an election system for the BCC that complies with Section

2.  The Defendants argue that the United States cannot establish the conditions necessary to

demonstrate a violation of Section 2 of the Voting Rights Act.

## II. Legal Analysis

### A. Legal Framework

Section 2 of the Voting Rights Act ("Section 2") provides, in its entirety:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (2006) (emphasis in original).  Subsection (b) is known as the "results test"

because "it seeks to measure the effect of vote dilution."  *Burton v. City of Belle Glade*, 178 F.3d

1175, 1196 (11th Cir. 1999).

---

denial occurs when a state, or . . . municipality, employs a standard, practice, or procedure that results in the denial of the right to vote on account of race." *Id*. at 1197-98 (internal citation and quotation omitted).  "[V]ote dilution occurs when an election practice results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of its choice." *Id*. at 1198. This is a vote dilution case.

The essence of a claim under Section 2 "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (hereinafter "*Gingles*").  The issue presented in such a case is "whether, as a result of the challenged practice or structure, [minority voters] do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id*. at 44.  To properly address that issue, courts are to assess the impact of the structure or practice in question on minority electoral opportunities on the basis of objective factors. *Id*.

Where a plaintiff alleges that multimember districts operate to impair minority voters' ability to elect their chosen representatives, the plaintiff must establish the following three "necessary preconditions," (commonly referred to as the "*Gingles* factors"):

> *First*, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.  If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates.  *Second*, the minority group must be able to show that it is politically cohesive.  If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests.  *Third*, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority candidate running unopposed – usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50-51 (emphasis supplied).[13]  Proof of each of the three *Gingles* factors is "necessary, but not sufficient, to prevail under a [S]ection 2 vote dilution claim." *Burton*, 178 F.3d at 1199; *see also Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994) (A court's examination of

---

[13] "Stated succinctly, a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Gingles*, 478 U.S. at 48-49.

relevant circumstances is not complete merely because the three factors have been satisfied.).

Thus, in addition to the three *Gingles* factors, courts are to consider a number of other factors

(hereinafter referred to as the "Senate Report Factors") that may be probative of a Section 2

violation, including:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction[;]
> 8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]
> 9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36-37.  This list is not exhaustive.  *U.S. v. Charleston County, S.C.*, 365 F.3d

341, 346 (4th Cir. 2004).  Certain of these factors may be more or less pertinent depending on the

type of Section 2 case at issue, and there is no requirement that any particular number of factors be

proved.  *Gingles*, 478 U.S. at 45.  Courts are to engage in a "searching, practical evaluation of the

past and present reality [and take] a functional view of the political process."  *Id.* (internal citations

and quotations omitted).

*B. Discriminatory Intent v. Discriminatory Effect*

Plaintiff may establish a violation of Section 2 "without proof of discriminatory intent in the design or maintenance of the challenged scheme." *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994). However, the plaintiff in a vote dilution case must at least demonstrate discriminatory effect under the results test, described above. *See id.* at 1523. That is, by viewing the objective factors of the results test as a whole, "that a voting community is driven by racial bias and that the challenged electoral scheme allows that bias to dilute the minority population's voting strength." *Id.* at 1524-25.

Generally, discriminatory effect will be shown through circumstantial evidence of the presence of the Senate Report Factors and the *Gingles* factors. *See Nipper,* 39 F.3d at 1520-24. "Proof of the second and third *Gingles* factors . . . is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process." *Id.* at 1524.

A defendant may rebut the plaintiff's evidence "by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by other, non-racial circumstances."[14] *Nipper*, 39 F.3d at 1524. If a defendant can prove, under the totality of the circumstances, "that racial bias does not play a major role in the political community, and the plaintiff cannot overcome that proof, then obviously Congress did not intend the plaintiff to win, *even if the plaintiff has proven bloc voting*." *Id.* (emphasis in original; internal punctuation omitted).

---

[14] Where a defendant offers such evidence, before ruling in favor of the plaintiff the court must be satisfied that "under the totality of the circumstances, the minority group is denied meaningful access to the political process on account of race or color." *Nipper*, 39 F.3d at 1524.

As discussed in detail below, the Plaintiff has been able to establish discriminatory effect on the basis of circumstantial evidence by satisfying all three *Ginlges* factors and several of the Senate Report Factors.  Therefore, the Court does not reach the issue of discriminatory intent.

C. *The First* <u>Gingles</u> *factor – Size and Compactness*[15]

A minority group making a Section 2 challenge must establish this first factor as a threshold matter because

> [u]nless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. . . .  Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure.

*Gingles*, 478 U.S. at 50 n.17.  "[C]ourts must consider the citizen voting-age population of the group challenging the electoral practice when determining whether the minority group is sufficiently large and geographically compact to constitute a majority." *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999) (internal citation and quotation omitted).  A single-member district is usually the appropriate standard, because it is the smallest political unit from which representatives are elected, against which to measure minority potential to elect chosen representatives.  *Gingles*, 478 U.S. at 50 n.17.

To decide "whether a minority group is sufficiently large and geographically compact", the proper type of data to be examined is "voting age population as refined by citizenship." *Negrón v.*

---

[15]The Second and Third *Gingles* factors are not in dispute, and are resolved in favor of the Plaintiff. (Joint Pre-Trial Statement, Doc. 72 at 2, 4).

*City of Miami Beach, Fla.*, 113 F.3d 1563, 1569 (11th Cir. 1997); *see also Growe v. Emison*, 507

U.S. 25, 38 n.4 (1993).  This is appropriate because

> [i]n order to elect a representative or have a meaningful potential to do so, a
> minority group must be composed of a sufficient number of voters or of those who
> can readily become voters through the simple step of registering to vote.  In order to
> vote or to register to vote, one must be a citizen. . . . [A] section 2 claim will fail
> unless the plaintiff can establish that the minority group constitutes an effective
> voting majority in a single-member district.

*Negrón*, 113 F.3d at 1569.  Courts may consider different types of data in resolving voting rights

cases.  Indeed, both the Supreme Court and the Eleventh Circuit have acknowledged that voter

registration data is credible and reliable.  *See Johnson v. DeSoto County Bd. of Commissioners*,

204 F.3d 1335, 1341-42 (11th Cir. 2000) (citing *Burns v. Richardson,* 384 U.S. 73 (1966)).

"Whether evidence derived from voter registration figures is sufficiently reliable to be admitted

and considered is a determination in the discretion of the district court."  *Johnson,* 204 F.3d at

1342.[16]

     This factor ultimately requires a plaintiff to demonstrate the existence of a proper remedy

in order to establish that "the minority has the potential to elect a representative of its own choice

from some single-member district."  *Burton*, 178 F.3d at 1199 (internal citations and quotations

omitted).  "The absence of an available remedy is not only relevant at the remedial stage of the

litigation but also precludes, under the totality of the circumstances inquiry, a finding of liability."

*Burton*, 178 F.3d at 1199 (internal citation and quotation omitted).  Therefore, "plaintiffs in vote

dilution cases must demonstrate that the challenged system suppressed minority voting strength in

---

[16] "[S]tatistical evidence derived from a sampling method, using reliable statistical techniques,
is admissible on the question of determining the relevant population."  *Johnson*, 204 F.3d at 1342.

comparison to some alternative, feasible benchmark system." *Negrón*, 113 F.3d at 1571 (internal

citation and quotation omitted).[17]

The Government's expert witness, Dr. Arrington, presented several plans in which he

attempted to create a majority Hispanic district. Using current voter registration data,[18] Dr.

Arrington constructed Plan A, which contained a reasonably compact district[19] with a 52%

Hispanic majority and 50% Hispanic voting age population. (Govt. PI Ex. 14).  Its Hispanic

registration level of 56.2%, based on recent voter registration data, supports a finding that this

District has a majority Hispanic CVAP.  Dr. Arrington also presented compelling evidence that

this district would perform (i.e. allow Hispanics a reasonable opportunity to elect candidates of

their choice). (Govt. PI Ex. 5 at 15-17, 26-29).  On its face, this evidence suggests that the first

*Gingles* factor has been met.[20]

However, Dr. Arrington's Plan uses 2000 Census data to satisfy the constitutional

proportionality requirement. (Doc. 88 at 2).  And, since the population of Osceola County has

grown by approximately 60,000 people since 2000, Arrington's analysis relies on the presumptive

---

[17]The ultimate viability of a proposed remedy is to be considered at the remedial stage of litigation, not during the analysis of the *Gingles* factors, because the goal of the first *Gingles* factor is to determine whether a solution is possible, not to present the final solution to the problem at hand. *Cottier v. City of Martin*, 445 F.3d 1113, 1117 (8th Cir. 2006).

[18]Voter registration data is considered a reasonable proxy for citizen voting-age population ("CVAP").

[19]District 1, which contains the predominantly Hispanic BVL area.

[20]Dr. Arrington also prepared a Plan B which reflects a majority-Hispanic CVAP of 50.37% in its District 1 based on 2000 Census data. (PI TR at 63-64; Govt PI Ex. 60-E).  Current voter registration data indicates that the district has a 58.5% Hispanic majority by registration. (Doc. 71 at 12).

validity of Census data.  In essence, this presumes that the new residents of Osceola County are distributed in proportion to the 2000 Census.

To rebut this presumption, the county presented evidence reflecting the distribution of new population based on the issuance of certificates of occupancy ("CO data") for new residential dwelling units.[21] (PI TR at 360-62).  However, Dr. Arrington was able to create Plan D, using the CO data provided by the County, which also satisfies the first *Gingles* factor. (Govt. TRL Ex. 87).[22]  The latest iteration of the County's CO data reflects that Arrington's Plan D is malapportioned.[23] (See TRL TR at 274-75).  Yet, this glitch can easily be rectified simply by moving three precincts from District 4 to District 5.  (See Govt. TR Ex. 140).

The Court concludes, therefore, that the Government has met all three *Gingles* factors.

### D. The Totality of the Circumstances – the Senate Report Factors

Plaintiff must demonstrate that "under the totality of the circumstances, the challenged electoral scheme deprives them of an equal measure of political and electoral opportunity to participate in the political process and to elect representatives of their choosing."  *Burton*, 178 F.3d at 1199 (internal citation and quotation omitted).  Generally, vote dilution cases are circumstantial evidence cases, because violations of Section 2 normally will not be established by direct testimonial evidence.  *Nipper*, 39 F.3d at 1526.  Thus, courts must make "particularized determinations" as to the various factors in the analysis and then weigh these findings as to each factor "in order to ascertain whether, in the aggregate, they point to dilution."  *Id*.  Courts

---

[21]There are significant concerns regarding the validity of this data. (See TRL TR at 34-35).

[22]The Parties agree that Arrington's Plan C is not applicable.

[23]As a rule of thumb, the Plan must have an overall deviation of 10% or less. (PI TR at 62).

-17-

considering vote dilution claims must consider all relevant and probative evidence,[24] and should

not exclude any evidence "if doing so would leave an incomplete view of the circumstantial

evidence picture." *Id*. at 1526-27.

It is important to note that while multimember districts and at-large voting schemes may

"operate to minimize or cancel out the voting strength of racial minorities in the voting

population," such schemes

> are not *per se* violative of minority voters' rights.  Minority voters who contend that
> the multimember form of districting violates § 2, must prove that the use of a
> multimember electoral structure operates to minimize or cancel out their ability to
> elect their preferred candidates.

*Gingles*, 478 U.S. at 47-48.[25]

The most important Senate Report Factors in a Section 2 challenge to multimember

districts are "the extent to which minority group members have been elected to public office in the

jurisdiction and the extent to which voting in the elections of the . . . political subdivision is

racially polarized."  *Gingles*, 478 U.S. at 50 n.15 (internal citation and quotations omitted).  If

these factors are present, the other factors "are supportive of, but *not essential to*" a Section 2

---

[24] "No single statistic provides courts with a short-cut to determine whether a set of electoral structures unlawfully dilutes minority voting strength."  *Nipper*, 39 F.3d at 1527 (internal citation, quotation and punctuation omitted).

[25] An at-large system cannot be responsible for diluting minority voting strength unless minority voters cohesively support particular candidates, the minority-preferred candidates are being systematically defeated by white bloc voting, and those defeats would not be occurring under a system of single-member districts.

*Charleston County*, 365 F.3d at 348.  "This is because where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters."  *Johnson v. Hamrick*, 296 F.3d 1065, 1072 (11th Cir. 2002).

challenge. *Id* at 51. (emphasis in original).  However, where a plaintiff challenges a multimember

district, "in the absence of significant white bloc voting it cannot be said that the ability of

minority voters to elect their chosen representatives is inferior to that of white voters." *Id*.

1) Senate Report Factor #2: Racial polarization

In a Section 2 case, the issue of racially polarized voting does not incorporate either

causation or intent. *Gingles*, 478 U.S. at 62.  Instead, it simply means that "the race of voters

correlates with the selection of a certain candidate or candidates; that is, it refers to the situation

where different races (or minority language groups) vote in blocs for different candidates."[26] *Id*.

The Supreme Court has emphasized that it "is the *difference* between the choices made by

[minorities] and whites – not the reasons for that difference – that results in [minorities] having

less opportunity than whites to elect their preferred representatives," and therefore "only the

correlation between race of voter and selection of certain candidates, not the causes of the

correlation, matters."[27]  *Id*. at 63 (emphasis in original).  Further, "it is the *status* of the candidate

as the *chosen representative of a particular racial group*, not the race of the candidate, that is

important." *Id*. at 68 (emphasis in original).

---

[26] The Eleventh Circuit has stated that "it does not understand the law to require Plaintiffs to prove racism determines the voting choices of the white electorate in order to succeed in a voting rights case." *Askew v. City of Rome*, 127 F.3d 1355, 1382 (11th Cir. 1997).

[27] Therefore, the Supreme Court has rejected the argument that "racially polarized voting refers only to white bloc voting which is caused by white voters' racial hostility toward black candidates." *Gingles*, 478 U.S. at 70-71.

As noted above, the Defendants concede that Hispanics in Osceola County are politically cohesive and that white voters usually vote in a bloc to defeat minority candidates. (Doc. 72 at 2, 4).  Both of these facts are evidence of racially polarized elections.

Dr. Arrington found that most elections in the County are ethnically polarized and that the degree of polarization is "extraordinarily high."[28]  (PI-TR at 49; Govt. PI Ex. 60-G, H, J, K).  In conducting his analysis, Dr. Arrington relied on voter registration data.  (PI TR at 83-84).  He explained that it would be preferable to use turnout data, because he prefers to examine what people actually did as opposed to what they theoretically could have done.  (Id. at 84).  He reviewed all of the elections that occurred in Osceola County between 1996 and 2004, excluding elections that were non-competitive (losing candidate received less than 10% of the vote) and elections in which there were fewer than ten precincts to analyze.  (Id. at 85-86).  He found the most important elections to be bi-ethnic elections, then elections for county commission, elections for offices that are similar to county commission based on the conduct of the campaign, then other types of elections.  (Id. at 86-87).  His analysis of at-large county commissioner elections showed that in every election except one, the voting was ethnically polarized, and that in every election except two, the Hispanic-preferred candidate lost.  (Id. at 88-89; Govt. PI Ex. 60-G).  The analysis of other elections shows a similar pattern of racially polarized voting.  (PI TR at 90-96; Govt. PI Ex. 60-H, I, J, K).[29]  Ultimately, his conclusion was that the "voting tends to be polarized, and

_____

[28] Where "polarized voting" is defined as "meaning that the Hispanics voted for one person, mostly, and the non-Hispanics voted for somebody else."  (PI TR at 71).

[29] Dr. Arrington's detailed, election by election analysis appears at Appendix B to his Declaration.  (*See* Govt. PI Ex. 4).

[Hispanics] tend to lose countywide elections." (PI TR at 94-95). It is clear from the record that voting in Osceola County tends to be racially polarized, therefore this factor is clearly present.

2) Senate Report factor #7:  Lack of Hispanic success in elections

In addition, the Court finds that there has been a history of a lack of Hispanic success at the polls, except for the brief period when the County employed a single-member district plan.[30]  Since 1996, no Hispanic candidate has been elected to either the BCC or the County's School Board despite the fact that Hispanic candidates continue to run and the Hispanic population continues to grow.  (Govt. PI Ex. 10 at 55).  Indeed, even Hispanic-preferred candidates have historically been unable to attain public office in countywide (at-large) elections.

This lack of success cannot be blamed on partisanship, for several reasons: (1) partisanship was never mentioned as a reason for supporting either single member or at-large districts during the public debates on the issue; (2) both the Democratic and Republican parties opposed the switch to SMDs in 1992, and neither party took a unified stand in 1996; and (3) there is no clear advantage for either party to take a position either supporting or opposing SMDs.[31]  (Govt. PI Ex. 10 at 56-57; PI TR at 324-25).

---

[30] This lack of success appears to have had a cyclical effect, whereby Hispanic participation in the political process (i.e., voting) increases if Hispanics believe that their preferred candidate has a chance to win.  (Govt. PI Ex. 8 at 15).  Conversely, there is a sense of futility that often leads Hispanics to not participate in contests where there does not appear to be a reasonable opportunity for their preferred candidate to win.  (Id. at 32-33; Govt. PI Ex. 5 at 9-10).

[31] There is also evidence that issues of ethnicity and partisanship are intertwined and difficult to separate; for example, in a race with two non-Hispanic (white) candidates, partisanship is weakest, but when a minority candidate participates in that race, "partisanship asserts itself." (PI TR at 685-86). The Government also demonstrated that Hispanic-preferred candidates are likely to lose countywide elections regardless of whether they are partisan elections.  (Govt. PI Ex. 6 at 5).

### 3) Senate report Factor #3: Election practices

One factor that enhances the opportunity for discrimination and contributes to the lack of Hispanic success in elections, particularly in an at-large election system, is the manner in which the County conducts its elections for the BCC. (See PI TR at 288-89). Commissioners' terms are staggered and are based on residency districts (or "numbered posts"), so that not all seats are vacant at each election. (PI TR at 106). This, in essence, imposes a majority vote requirement in elections which are "one on one" for each available seat, a system which makes it very difficult, if not impossible, for a minority to elect its preferred candidate. (Id.). If all five commissioners were to run at once, however, without numbered posts, a minority group such as Hispanics could all vote cohesively for a single candidate and if the non-Hispanics split their votes among various candidates, the minority would have a reasonable chance to elect its preferred candidate. (Id. at 106-7, 289). In addition, the County requires runoff elections for the primary elections, which allows non-Hispanics to run more than one candidate in the primary election, and then, in the runoff, assuming a Hispanic candidate makes the runoff, to solidify their votes in order to defeat the Hispanic candidate. (Id. at 289). A single-member district system, in contrast, would make it easier for candidates to cover their respective areas, and would significantly decrease the costs associated with their campaigns. (PI TR at 210-11; Govt. PI Ex. 31 at 4).

### 4) Senate report Factor #5: Socioeconomic disparities

As discussed above, there is, both presently and historically, a socioeconomic disparity between Hispanics and non-Hispanics in Osceola County. Hispanics in Osceola County have lower levels of education and income, and are more likely to be living in poverty than are non-

Hispanics, particularly non-Hispanic whites.[32]  (PI-TR at 50, 101-102; Govt. PI Ex. 8 at 5; Govt. PI Ex. 60-S).  These disparities make it more difficult for Hispanic candidates to run for countywide office than it would be to run in SMDs, due to the combination of significantly greater costs associated with countywide elections and the difficulty that Hispanic candidates have in securing financial support.  (*See* Govt. PI Ex. 8 at 27).  A great deal of money is required to run a countywide campaign, and often Hispanic candidates are unable to raise sufficient funds to cover campaign activities such as mailings or broadcast media advertisements.  (PI TR at 202-203).

Dr. Arrington referred to this as a "synergy, an interaction between barriers such as countywide elections and the effects of socioeconomic status."  (PI TR at 103).[33]  The disparity in socioeconomic status is reflected by a disparity in terms of participation in the political process.  (Id. at 104).  As far back as 1998, 76% of the non-Hispanic voting age population of Osceola County that was registered to vote participated in general elections, compared with only 43% of Hispanics, a difference of 33 percent.  (Govt. PI Ex. 60-T).  This gap narrowed in 2000 to 26%

_____

[32] In addition, 48% of Hispanics speak English less than "very well."  (Govt. PI Ex. 8, Table 6).

[33] The Defendants argue that the lower level of political participation is based on the fact that more than half of the Hispanics in Osceola County have been there less than five years, and that it is well-established in social science that political participation lags well behind arrival in a community. (PI TR at 368-69).  They also assert that many of the Hispanics are young adults, who are the least politically active age group.  (Id. at 369-70).  The Defendant's expert admitted, however, that not all of the difference in voter turnout between Hispanics and non-Hispanics can be accounted for solely based on residency tenure, there is a "persistent difference, regardless of tenure, between Hispanics and non-Hispanics," and that discrimination could be a factor causing part of that differential.  (Id. at 425-26).

(80% non-Hispanic versus 54% Hispanic), and to 11% in 2002 (77% non-Hispanic versus 66% Hispanic).[34]  (Id.).

5) Senate report factor #1: History of discrimination against Hispanics

There is also evidence of a history of discrimination against Hispanic voters and candidates in Osceola County.[35]  Throughout the 1990s, problems with registering Hispanic voters persisted because information was not available in Spanish, and the Supervisor of Elections' office did not have Spanish-speaking workers available to answer questions or provide assistance.  (Govt. PI Ex. 8 at 18-19).  In addition, the elections process in the 1990s was conducted in English, with ballots, voter guides, signs and forms available only in English and the County made no efforts to recruit bilingual poll workers or hire bilingual elections staff.  (Id. at 20).  These issues continued during the 2000 elections.  In addition, during the 2000 elections, Hispanics suffered from discrimination at the polls when they were turned away without being allowed to vote, refused assistance, forbidden to use their own interpreters, asked for multiple forms of identification (unlike non-Hispanic voters), and treated in a hostile manner by poll workers.  (Id. at 21).  In 2002, the County signed a consent decree with the Department of Justice to provide information and assistance to

---

[34] According to Dr. Arrington, this gap in participation cannot be explained simply by a difference in citizenship status, because even if one were to examine CVAP data, there would still be a gap between Hispanic and non-Hispanic participation rates.  (PI TR at 105).

[35] Discrimination toward Hispanics has not been limited solely to the political arena.  For example, there have been multiple incidents in which employers or authority figures banned the speaking of Spanish.  (Govt. PI Ex. 8 at 7-8).  Discriminatory graffiti has appeared in public places frequented by Hispanics.  (Id. at 9; Govt. PI Ex. 30 at 3).  Hispanics have suffered from discrimination in employment and when applying for mortgages.  (Govt. PI Ex. 8 at 10).  Multiple editorials appeared in local newspapers either disparaging Hispanics or expressing potentially discriminatory messages. (Id. at 11-12).

voters in Spanish.  (Id. at 24).  While this has improved conditions somewhat, problems have

persisted and the County has not met all of the requirements of that decree.  (Id. at 25).

Accordingly, the Department of Justice has extended its supervision over the County's program.

(Id. at 26).

One key to political success is involvement with, and membership on, county boards and

committees, which facilitate community involvement.  (Id. at 35).  Hispanics, however, represent

only 8% of the membership of the County's various boards and commissions, and as of 2006, six

of the County's fifteen boards and commissions had no Hispanic members.  (Id.).  Some Hispanics

have encountered resistance to their participation, and have not been appointed to serve despite

their requests to do so.  (Id.; Govt. PI Ex. 37 at 5).

**III. Conclusion**

For the reasons stated herein, the Court finds that all three *Gingles* factors are present, that

a majority of the Senate Report Factors have been shown to exist and therefore, under the totality

of the circumstances, Osceola County's voting system has caused a dilution of Hispanic votes in

violation of § 2 of the Voting Rights Act.  Accordingly, it is

**ORDERED** that the Parties shall submit proposed remedial plans, in accordance with this

order, by Noon on November 22, 2006.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 18, 2006.

Copies furnished to:

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Counsel of Record

Unrepresented Party